UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| RAY ANTHONY FUQUA, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| vs. ) | Case No. 5:18-cv-00334-HNJ |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

This medical malpractice action, filed pursuant to the Federal Tort Claims Act (FTCA), proceeds before the court on the United States' Motion for Summary Judgment. (Doc. 55). As discussed herein, the United States prevails in its contention that Plaintiff Ray Anthony Fuqua cannot succeed on his malpractice claim because he has not offered expert testimony addressing the United States' alleged breach of the standard of care. Therefore, the court will grant the United States' Motion for Summary Judgment and enter summary judgment in the United States' favor.

## SUMMARY JUDGMENT STANDARD

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions

of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23. Thus, if the nonmoving party will bear the burden of proof at trial, "the moving party may discharge [its] 'initial responsibility' [at summary judgment] by showing that there is an absence of evidence to support the nonmoving party's case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1437-38 (11th Cir. 1991)). Or, the movant may sustain its initial summary judgment burden by submitting "affidavits or other similar materials *negating* the opponent's claim," *Celotex,* 477 U.S. at 323 (emphasis in original), that is, "by showing that the nonmoving party will be unable to prove its case at trial." *Hickson Corp.*, 357 F.3d at 1260.

If the movant sustains its initial summary judgment burden, a non-moving party demonstrates a genuine issue of material fact by producing evidence by which a reasonable fact-finder could return a verdict in its favor. *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation omitted). The non-movant sustains this burden by demonstrating "that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). In the alternative, the non-movant may "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116-17; *see also Doe v. Drummond Co.*, 782 F.3d 576, 603-04 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1168 (2016).

The "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151 (citation omitted). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least

3

to the extent that that evidence comes from disinterested witnesses.'" *Id.* (citation omitted).

There exists no issue for trial unless the nonmoving party submits evidence sufficient to merit a jury verdict in its favor; if the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249. The movant merits summary judgment if the governing law on the claims or defenses commands one reasonable conclusion, *id.* at 250, but the court should deny summary judgment if reasonable jurors "could return a verdict for the nonmoving party." *Id.* at 248. That is, a court should preserve a case for trial if there exists "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

## PROCEDURAL HISTORY

On March 1, 2018, Ray Anthony Fuqua filed this case *pro se*, asserting that the Veterans Affairs (VA) Hospital in Birmingham, Alabama, performed a knee surgery on him that did not adequately treat his problem and caused pain and a limp. (Doc. 1). On October 29, 2018, this court denied Defendant's motion to dismiss Fuqua's case as untimely (Doc. 24), and on November 13, 2018, the court referred the case to this District's Civil Pro Bono Panel. (Doc. 26). After the initial attorney randomly selected from the panel declined to represent Fuqua, a second reviewing attorney from the pro bono panel entered an appearance for Fuqua on December 7, 2018. (Doc. 28). On March 20, 2019, that attorney filed a First Amended Complaint, asserting a medical

malpractice claim against the United States of America pursuant to the FTCA. (Doc. 34).

The parties proceeded with discovery, but on March 25, 2021, Fuqua's attorney filed a motion to withdraw as his new employment with a Public Defender's office precluded him from continuing to provide *pro bono* representation to Fuqua in this civil matter. (Doc. 51). Fuqua did not object to the motion to withdraw despite receiving notice of it. Therefore, the court granted the motion to withdraw on April 15, 2021, and directed the Clerk to again enter Fuqua as proceeding *pro se.* (Doc. 54). Afterwards, the court referred Fuqua's case to a pro bono veterans clinic at a law school for possible representation, but the clinic declined to represent Fuqua.

On May 14, 2021, The United States filed its motion for summary judgment, arguing that Fuqua cannot sustain his burden of proving medical malpractice without medical expert testimony. (Doc. 55). On June 3, 2021, Fuqua filed a response to the motion for summary judgment, stating only:

> I the Plaintiff opposes [*sic*] the Defendant's request for the court to order summary judgment because my lawyer . . . has withdrawn from my case and I do not have legal representation. I would ask the court to ap[p]oint me a lawyer and give me more time for discovery so I can give my facts and documents pertaining to this case.

(Doc. 60, at 1).

### PLAINTIFF'S REQUEST FOR APPOINTMENT OF COUNSEL

No constitutional right to counsel exists in a civil case. *Bass v. Perrin*, 170 F.3d 1312, 1320 (11th Cir. 1999). The appointment of counsel in a civil matter constitutes a

5

privilege justified only by exceptional circumstances, such as novel or complex litigation. *Fowler v. Jones*, 899 F.2d 1088, 1096 (11th Cir. 1990); *Vickers v. Georgia*, 567 Fed. App'x 744, 749 (11th Cir. 2014).  As Fuqua's claims do not present particularly novel or complex issues, the Constitution does not require the court to appoint an attorney to represent him.  Even so, the court attempted to secure legal representation for Fuqua through the district's pro bono panel and a veterans assistance clinic.  While one attorney agreed to represent Fuqua during a portion of this litigation, he had to withdraw his representation for valid professional reasons.  Other attorneys and the pro bono veterans clinic declined to assist Fuqua.  For these reasons, the court concludes requiring an attorney to represent Fuqua would not serve the ends of justice, and it **DENIES** Fuqua's request for appointment of counsel.

For similar reasons, the court declines to appoint an expert witness to assist Fuqua.  *See* Fed. R. Evid. 706(a) ("On a party's motion or on its own, the court may order the parties to show cause why expert witnesses should not be appointed . . . ."); *Steele v. Shah,* 87 F.3d 1266, 1271 (11th Cir. 1996) (decision to appoint an expert witness falls within the district court's discretion); *Rodriguez v. Powell,* 853 F. App'x 613, 619 (11th Cir. 2021) (quoting *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1348 (11th Cir. 2003)) ("'Such an appointment is especially appropriate where the evidence or testimony at issue is scientifically or technically complex.'").

## SUMMARY OF RELEVANT FACTS

Plaintiff, Ray Anthony Fuqua, served in the United States Army between 1988 and 1992, and he most recently worked as a commercial truck driver. (Doc. 55-1, at 5; Doc. 55-2, at 1-2). He sought treatment for knee pain at the VA Hospital in Birmingham, Alabama. On September 29, 2014, diagnostic imaging revealed degenerative changes in both knees and evidence of a prior anterior cruciate ligament (ACL) repair in the left knee. (Doc. 59-1, at 12, 722). On October 27, 2014, Fuqua reported to his medical provider that he "has always been bow-legged" and had developed bilateral knee pain. (*Id.* at 707).

Fuqua underwent a left knee replacement surgery on November 5, 2014. He planned to pursue a right knee replacement later if the left knee surgery produced satisfactory results. He discharged from the hospital in good condition three days after the surgery. (*Id.* at 788-89). During a follow-up appointment on December 15, 2014, Fuqua was "doing fairly well" and could ambulate without aid. (*Id.* at 578). Diagnostic imaging from that same date reflected no changes in his left knee since the surgery, but Fuqua did experience further degenerative changes in the right knee. (*Id.* at 10-11).

Fuqua attended another follow-up appointment in February 2015. Sometime after that appointment, he fell, heard a "pop" in his knee, and began experiencing pain and decreased range of motion. However, he did not return to the VA until August 17, 2015, his next scheduled appointment. On that date, the clinical examination revealed reduced range of motion, warmth, swelling, quad atrophy, hamstring tightness, laxity in

7

flexion, and pain upon palpation. (*Id.* at 528, 554). On October 5, 2015, a CT scan detected a patella fracture (Doc. 59-1, at 551), and on November 24, 2015, Fuqua underwent a left revision patella replacement. (*Id.* at 787-88).

Fuqua reported good post-surgical progress the day of the surgery, on December 3, 2015, and on January 14, 2016. (*Id.* at 459, 481, 788). However, on March 10, 2016, he reported increased pain and decreased function in his left knee. The attending physician detected "[e]xtreme quad atrophy" and predicted Fuqua could not return to work for at least three months. (*Id.* at 458).

On April 14, 2016, the examining physician observed Fuqua had experienced an "event" two to three months earlier that caused decreased range of motion. The physician predicted that Fuqua would never return to gainful employment as a commercial truck driver. (*Id.* at 450). On June 16, 2016, the attending physician noted Fuqua continued to experience stiffness in his left knee and remained unable to work, and he stated Fuqua should "consider additional surgery." (*Id.* at 448).

## DISCUSSION

Fuqua's Amended Complaint asserts he suffered injuries because of the medical negligence of one or more employees or agents of the United States Department of Veterans Affairs. (Doc. 34, ¶ 2). Specifically, Fuqua asserts those employees breached the applicable standard of medical care when they failed to:

> (1) insert a properly-sized and adequate prosthetic component during his initial surgery on November 5, 2014; (2) properly care for Mr. Fuqua following his November 2014 operation, including failure to timely sign

and execute orders for postoperative care and failure to recognize and respond to the fracture of his patella; (3) properly assess, repair, and resurface Mr. Fuqua's left knee on November 19, 2015; and (4) properly follow up on Mr. Fuqua's complaints of pain, infection, and loss of function at all times from November 5, 2014 to September 25, 2018.

(*Id.* ¶ 27).

Fuqua's claim arises under the FTCA, which grants district courts

exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). Thus, the court determines liability in an FTCA case based upon events occurring in Alabama "in accordance with" Alabama state law. *See Stevens v. Battelle Mem'l Inst.*, 488 F.3d 896, 899 n.3 (11th Cir. 2007) (citing *Cole v. United States,* 755 F.2d 873, 879 n. 16 (11th Cir. 1985); 28 U.S.C. § 1346(b)); *Ross v. United States*, 640 F.2d 511, 519 (5th Cir. 1981) ("[T]he law of Alabama, situs of the airplane crash, will be determinative in the treatment of the legal issues in the case sub judice.").[1]

The Alabama Medical Liability Act (AMLA) governs all medical malpractice claims in the state of Alabama. *See* Ala. Code § 6-5-551 ("In any action for injury, damages, or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, whether resulting from acts or omissions

---

[1] All decisions of the former Fifth Circuit handed down prior to September 30, 1981, constitute binding precedent in this Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

in providing health care, or the hiring, training, supervision, retention, or termination of care givers, the Alabama Medical Liability Act shall govern the parameters of discovery and all aspects of the action."). Under the AMLA, a medical malpractice plaintiff must prove "(1) the appropriate standard of care, (2) the doctor's deviation from that standard, and (3) a proximate causal connection between the doctor's act or omission constituting the breach and the injury sustained by the plaintiff." *Hauseman v. Univ. of Alabama Health Servs. Found.*, 793 So. 2d 730, 734 (Ala. 2000) (citing *Looney v. Davis,* 721 So. 2d 152, 157 (Ala. 1998); *Complete Family Care v. Sprinkle,* 638 So. 2d 774 (Ala. 1994); *Bradford v. McGee,* 534 So. 2d 1076 (Ala. 1988); Ala. Code § 6-5-484).

"To defeat a properly supported motion for a summary judgment on a medical-malpractice claim, the nonmovant ordinarily must present testimony from a 'similarly situated' medical expert." *Hauseman,* 793 So. 2d at 734 (citing *Levesque v. Regional Med. Ctr. Bd.,* 612 So. 2d 445, 449 (Ala. 1993)); *see also Pruitt v. Zeiger*, 590 So. 2d 236, 238 (Ala. 1991) (citing *Rosemont, Inc. v. Marshall,* 481 So. 2d 1126 (Ala. 1985)) ("The failure of an expert to establish the standard of care results in a lack of proof essential to a medical malpractice plaintiff's case."). Such testimony satisfies the nonmovant's burden to present substantial evidence creating a genuine issue of material fact once the movant makes a prima facie showing that no material fact issues exist. *Harris v. Health Care Auth. of City of Huntsville*, 6 So. 3d 468, 477 (Ala. 2008).

In the present case, the United States supported its motion for summary judgment by demonstrating that Fuqua lacks the medical expert testimony necessary to

prove his case at trial. *See Hickson Corp.,* 357 F.3d at 1260 (citing *Four Parcels of Real Property,* 941 F.2d at 1437-38). Consequently, to defeat the United States' motion for summary judgment, Fuqua needed to present medical expert testimony to define the standard of care and establish the VA's breach of that standard.[2] Because Fuqua offered no such expert testimony, he failed to sustain his summary judgment burden of demonstrating disputed material facts, and his malpractice claim cannot survive the United States' motion for summary judgment.

None of the exceptions to the general rule that a medical malpractice plaintiff must present expert medical testimony applies. A plaintiff may forego expert testimony when "the lack of care is so apparent as to be within the ken of the average layman," such as when a surgeon leaves a sponge or other instrumentality inside the patient's body or operates on the wrong limb. *Peterson v. Triad of Alabama, LLC,* – So. 3d – , No. 1190982, 2021 WL 2678098, at *3 (Ala. June 30, 2021) (citing *Jones v. Bradford,* 623 So. 2d 1112, 1114-15 (Ala. 1993)). Other exceptions exist if the plaintiff relies upon an authoritative medical treatise, or if the plaintiff himself qualifies as a medical expert. *Id.* at *4 (citing *Collins v. Herring Chiropractic Center, LLC,* 237 So. 3d 867, 871 (Ala. 2017)).

Here, Fuqua does not claim to possess medical expertise, and he has not

---

[2] The court notes that even if Fuqua could prove his surgeries failed to successfully treat his symptoms and conditions, that failure, standing alone, would not support a medical malpractice claim. *See* Ala. Code § 6-5-484(b) ("Neither a physician, a surgeon, a dentist nor a hospital shall be considered an insurer of the successful issue of treatment or service."); *McGill v. Szymela,* – So. 3d – , No. 1190260, 2020 WL 7778222, at *7 (Ala. Dec. 31, 2020) (citations omitted) ("Consistent with [§6-5-484(b)], it is well established in Alabama that a poor medical outcome alone does not give rise to medical-malpractice liability.").

presented any authoritative medical treatises to establish the applicable standard of care. Moreover, the evidence does not depict a situation in which an average layperson would understand, without the benefit of expert testimony, that Fuqua's medical providers breached the standard of care, or that any breach of care caused his alleged damages.

In addition to classic examples involving leftover surgical instrumentality or operations on the wrong limb, case law interpreting the AMLA eschews the necessity of expert testimony only when providers make obvious errors or omissions, like leaving a cold pack on the patient's skin long enough to cause frostbite, *Collins*, 237 So. 3d at 871-72, failing to fill an open tooth cavity for fourteen months, *Vieux v. Fed. Bureau of Prisons*, No. 112CV00017MHHHGD, 2016 WL 4070138, at *8 (N.D. Ala. July 29, 2016), failing to ensure a metal bar heated to 270 degrees during sterilization had cooled sufficiently before attaching it to a patient's arm, *McGathey v. Brookwood Health Servs., Inc.*, 143 So.3d 95 (Ala. 2013), or ignoring a recent back surgery patient's calls for ambulation assistance for 30 minutes. *Ex parte HealthSouth Corp.*, 851 So. 2d 33, 38 (Ala. 2002).

In contrast, when "there are numerous possible explanations for how the incident occurred . . . , expert medical testimony from a similarly situated health-care provider is necessary to establish the applicable standard of care, a deviation from that standard, and proximate causation linking the defendant's actions to the plaintiff's injury." *Fletcher v. Health Care Auth. of City of Huntsville*, – So. 3d – , No. 1190706, 2021 WL 2678100, at *5 (Ala. June 30, 2021) (citing *Lyons v. Walker Regional Medical Center*, 791 So. 2d 937, 942 (Ala. 2000)).

Here, the evidence depicts a complex medical situation, not an obvious error or omission. Fuqua experienced bilateral knee pain and arthritis before his left knee replacement surgery at the VA, and he described his stance as "bow-legged." He even underwent a prior reconstructive surgery on his left ACL. Fuqua presented for a single follow-up visit after his November 5, 2014, knee replacement surgery. That visit produced positive findings, and he did not return to the VA until August 17, 2015, when he reported left knee pain and decreased range of motion after experiencing a "pop" in his knee from a possible fall in February 2015. Doctors discovered Fuqua fractured his left patella, necessitating an additional surgery on November 24, 2015. Fuqua initially recovered well after that procedure, but by March 10, 2016, he reported increased pain and decreased range of motion, which his examining physician attributed to an "event" occurring approximately two to three months earlier.

As the United States points out, those facts raise multiple questions, including:

- Whether either of Fuqua's two arthroplasties at the VA were conducted within the applicable standard of care;

- Whether Fuqua's apparent fall in or about February 2015 caused or exacerbated the condition necessitating the second knee surgery;

- Whether the pain and degeneration in Fuqua's right knee was associated in any way with Fuqua's left knee surgeries, as Fuqua alleges, or existed independently thereof, as a result of the natural aging process and his existing arthritis;

- Whether Fuqua's fall in February 2015 and his failure to visit the doctor in the six months between that fall, when he first noticed a "pop" in his knee and decreased [range of motion] therein, was in fact the actual or proximate cause of his need for a second surgery; and

- Whether the subsequent surgeries Fuqua alleges to have had conducted on his right knee were necessitated by medical malpractice with respect to his left knee surgeries or whether such surgeries would have been necessary independent of his left knee surgeries or any medical malpractice allegedly associated therewith.

(Doc. 55, at 20).

As an ordinary layperson could not adequately answer those questions without professional assistance, Fuqua needed to present expert testimony. *See McGill v. Szymela*, No. 1190260, 2020 WL 7778222, at *6 (Ala. Dec. 31, 2020) (expert testimony required to establish the standard of care for a complex surgery to place a prosthesis).

## CONCLUSION

As discussed herein, because Fuqua has not presented expert medical testimony establishing a breach of the applicable standard of care, he cannot sustain his burden of demonstrating genuine disputes of material facts remain for trial on his FTCA medical malpractice claim. Accordingly, the court will grant the United States' Motion for Summary Judgment and enter summary judgment in the United States' favor. The court will enter a separate final judgment.

**DONE** this 4th day of November, 2021.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE